UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

KENNETH R. LEAVITT           :

VS.                        :      CIVIL ACTION NO.

TOWN OF MIDDLEFIELD,     :
PAUL PIZZO, DAVID LOWRY and  :
MIDDLEFIELD HOLDINGS, LLC  :      DECEMBER 11, 2008

## C O M P L A I N T

    1.  This is an action to redress the deprivation of rights secured to the plaintiff by the Constitution and laws of the United States and the State of Connecticut.

    2.  Jurisdiction of this court is invoked under the provisions of Sections 1331, 1343(3) and 1367(a) of Title 28 and Sections 1983 and 1988 of Title 42 of the United States Code.

    3.  The plaintiff is an adult citizen of the United States who resides in Middlefield, Connecticut.

    4.  The defendant Town of Middlefield is a municipality in the State of Connecticut.

    5.  The defendant Paul Pizzo is, and for many years has been, a member

1

of the Board of Finance of the Town of Middlefield and during much of that time has been its chairman.  He is sued only in his individual capacity.

6.  The defendant David Lowry is, and for many years has been, the Second Selectman of the Town of Middlefield.  He is sued only in his individual capacity.

7.  The defendant Middlefield Holdings, LLC, is a Connecticut Limited Liability Company which maintains an office in Westport, Connecticut.

8.  During all times mentioned in this Complaint, the defendants Town of Middlefield, Pizzo and Lowry were acting under color of law, that is, under color of the constitution, statutes, laws, rules, regulations, customs and usages of the State of Connecticut.

9.  At all times mentioned in this Complaint, all of the defendants acted jointly and in concert and conspiracy with each other for the improper and unlawful purposes hereinafter described.

10.  The plaintiff has devoted the last sixteen years of his life to purchasing, developing and maintaining the Powder Ridge Ski Area, consisting of approximately 246 acres of land in the Town of Middlefield, the City of Meriden and the Town of Wallingford, Connecticut, plus an adjacent related 32-acre parcel in Middlefield, Connecticut.  This ski resort has been in existence since 1959 and is a major tourist attraction in the State of Connecticut and

Southern New England.

11.  After expending many years and substantial sums of money on the effort, the plaintiff purchased the aforesaid ski area on or about January 27, 1997, through White Water Mountain Resorts of Connecticut, Inc., a Connecticut corporation of which he was the President and of which he has been the sole owner since 1998.

12.  For the first five ski seasons after the plaintiff's acquisition of the property, sales increased every year to a point double the annual sales when the plaintiff first acquired the property.  A successful summer camping program was initiated and numerous permits were obtained to rehabilitate and expand the operation.  Independent appraisals obtained in 2006 valued the total 278-acre property at approximately $6.5 million.

13.  Deteriorating infrastructure, however, coupled with unfavorable weather conditions and on-going major permitting costs brought on by an opposition group in which defendant Pizzo and his wife played a major role, necessitated the infusion of additional capital to maintain and upgrade the ski area.  Eventually, the defendant Middlefield Holdings, LLC, became the creditor of both White Water Mountain Resorts of Connecticut, Inc., and the plaintiff personally, securing the debt in part with a first mortgage on the plaintiff's private residence.

3

14.  Concomitantly with the foregoing events, the defendants Pizzo and Lowry used their powerful positions in the government of the defendant Town of Middlefield to obstruct and prevent the plaintiff from developing the property in a manner which would assure its economic viability.  The defendant Town of Middlefield itself has expended hundreds of thousands of taxpayer dollars on legal fees for the purpose of driving White Water Mountain Resorts of Connecticut, Inc., into bankruptcy and preventing it from emerging from bankruptcy as a financially viable entity for the purpose of obtaining the property at a value well below the fair market value as established by the Town's own appraisals.

15.  The defendants Town of Middlefield, Pizzo and Lowry have intentionally and irrationally subjected the plaintiff and his company to outrageously arbitrary actions entirely different from the treatment accorded to other owners and developers of commercial property in the town identically situated to the plaintiff.

16.  As an intended consequence of the aforesaid arbitrary and unlawful actions, the defendant Middlefield Holdings, LLC, was able to foreclose upon the property described in Paragraph 10, and now is poised to foreclose upon the plaintiff's personal residence.

17.  As a further intended consequence of the aforesaid arbitrary and

4

unlawful actions, the defendant Town of Middlefield has entered into a contract with the defendant Middlefield Holdings, LLC, to purchase the aforesaid property, the true value of which is approximately $6.5 million, for $2,550,000. Unless restrained by this court, the closing upon the said purchase will take place during December 2008.  A true and accurate copy of the Sales Agreement between the defendants is attached hereto as *Exhibit A*.

18.  In the manner described above, the defendants jointly and in conspiracy with each other have orchestrated the seizure of the plaintiff's property without procedural due process of law, have deprived the plaintiff of equal protection of the laws, have deprived the plaintiff of substantive due process of law, and have deprived the plaintiff of his liberty interest in the practice of his profession, also without due process of law, and all in violation of the Fourteenth Amendment to the United States Constitution as enforced through Sections 1983 and 1988 of Title 42 of the United States Code.

19.  As a result, the plaintiff has suffered and in the future will suffer economic losses and emotional distress.

20.  Moreover, unless restrained by this court, the defendants will consummate the sale of the entire Powder Ridge Ski Area and Resort at far less than fair value, thereby inflicting irreparable injury upon the plaintiff.

WHEREFORE, the plaintiff claims judgment against the defendants and

5

each of them, jointly and severally, for compensatory damages, punitive

damages as to the defendants Pizzo and Lowry, attorney fees, costs, and as to

the defendants Town of Middlefield and Middlefield Holdings, LLC, a temporary

and permanent injunction restraining said defendants from consummating the

sale described in *Exhibit A*.

   ***The plaintiff claims trial by jury.***

                              THE PLAINTIFF

                       BY:
                              JOHN R. WILLIAMS (ct00215)
                              51 Elm Street
                              New Haven, CT 06510
                              203.562.9931
                              Fax:  203.776.9494
                              jrw@johnrwilliams.com
                              His Attorney

# V E R I F I C A T I O N

STATE OF CONNECTICUT     )
                          )    SS:      New Haven
COUNTY OF NEW HAVEN     )

       KENNETH R. LEAVITT, having been duly sworn, states:

       1.  I am the plaintiff in this action.

       2.  The allegations of the Complaint herein are true and accurate to the best of my knowledge, information and belief.

_____
KENNETH R. LEAVITT

Subscribed and sworn to before me this 11th day of December, 2008.

_____
Commissioner of the Superior Court

# EXHIBIT   A

## SALES AGREEMENT

AGREEMENT made as of the _1_ day of _December_, 2008, between **Middlefield Holdings, LLC**, a Delaware limited liability company having its principal address at c/o WCP Investment Manager, LLC, 55 Post Road West, Suite 320, Westport, Connecticut 06880 (hereinafter referred to as the "Seller"), and the **Town of Middlefield**, a municipal corporation located in the County of Middlesex and State of Connecticut (the "Town") (referred to as the "Buyer").

## WITNESSETH:

1.      **PROPERTY.** The Seller, in consideration of the purchase price hereinafter specified, hereby agrees to sell and convey, and the Buyer hereby agrees to purchase (a) the real property commonly known as 99 Powder Hill Road, Middlefield, Connecticut 06455, 598 High Hill Road, 552 High Hill Road and 371 Fleming Road in Meriden and 352 High Hill Road in Wallingford, Connecticut as described in Schedule A attached hereto including any remaining chairlifts and other fixtures (collectively, the "Real Property"); and (b) certain personal property collateral to be acquired by Seller under the terms set forth in Paragraph 14(a) hereunder: (i) as listed on Schedule B attached hereto and incorporated herein, any pumping equipment and pipes; and (ii) any rights in or under: any permits and concessions, executory contracts, the Waterline Lease with the Town of Middlefield dated January 9, 2004, goodwill, all interests in intellectual property collateral of Seller, including without limitation the domain name powderridgect.com, the content of the website displayed at www.powderridgect.com, as well as the names "Powder Ridge Ski Area" (and any derivation thereof) and "Powder Ridge Ski Resort" (collectively, the "Personal Property").

2.      **CONSIDERATION.** The purchase price is TWO MILLION FIVE HUNDRED FIFTY THOUSAND and xx/100 ($2,550,000) DOLLARS cash plus the assumption of real estate taxes and personal property taxes owed to the Town of Middlefield with respect to the Real Property and the Personal Property (the "Purchase Price") which the Buyer agrees to pay as follows:

| | | |
|---|---|---|
| (a) | DEPOSIT OF 5% OF PROPOSED PURCHASE PRICE UPON EXECUTION AND DELIVERY OF THIS SALES AGREEMENT: | $127,500.00 |
| (b) | AT CLOSING | $2,422,500.00 + Assumption of Taxes |
| | TOTAL: | $2,550,000.00 + Assumption of Taxes |

3.      **CLOSING DATE.** The closing shall take place at the offices of Murtha Cullina LLP, CityPlace I, 185 Asylum Street, 29th Floor, Hartford, Connecticut on or before December 15, 2008,

1

or sooner or later by agreement of the parties (the "Closing Date"). At the closing, the Buyer will be required to pay to the Seller by certified check *or* bank check the Balance of the Purchase Price as defined above, or the parties may elect to close in escrow.

4.     **DEPOSIT.** A deposit of Five Percent (5%) of the Proposed Purchase Price (the "Deposit") is required under this Sales Agreement. CATIC Exchange Solutions, Inc. (the "Escrow Agent") shall place the Deposit in an interest bearing account. If the Buyer shall fail to fulfill the Buyer's agreements herein, the Deposit made hereunder by the Buyer shall be immediately disbursed to the Seller as liquidated damages, which shall be the Seller's sole and exclusive legal or equitable remedy, and this Sales Agreement shall thereupon terminate and become null and void. The parties agree that the retention of the full Deposit shall be considered as liquidated damages by reason of the fact that it will be impossible to ascertain the actual damages suffered by Seller, and the parties agree that the Deposit constitutes a reasonable estimate of such damages. The actual tender of the Deed shall not be necessary if Buyer has clearly indicated, in writing, prior to the Closing Date, that it will not or cannot make the payments agreed upon.

The Escrow Agent shall hold the proceeds thereof in escrow in an interest bearing bank account (or as otherwise agreed in writing by Seller, Buyer and Escrow Agent) until the Closing or earlier termination of this Agreement and shall pay over or apply the Deposit in accordance with the terms of this Agreement. Any interest earned on the full Deposit shall automatically be deemed part of the full Deposit. At the Closing, the Escrow Agent shall pay the Deposit to Seller. If for any reason the Closing does not occur and either party makes a written demand upon the Escrow Agent for payment of the Deposit, the Escrow Agent shall give written notice to the other party of such demand. If the Escrow Agent does not receive a written objection from the other party to the proposed payment within five (5) business days after the giving of such notice, the Escrow Agent is hereby authorized to make such payment. If the Escrow Agent does receive a written objection within such five (5) business day period or if for any other reason the Escrow Agent in good faith shall elect not to make such payment, the Escrow Agent shall continue to hold the full Deposit until otherwise directed by written instructions from Seller and Buyer or a final judgment of a court. The Escrow Agent shall, however, have the right at any time to deposit the full Deposit with the court, giving written notice of such deposit to Seller and Buyer. Upon such deposit the Escrow Agent shall, however, be relieved and discharged of all further obligations and responsibilities hereunder.

The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, and the Escrow Agent shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Agreement or involving gross negligence. Seller and Buyer shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable counsel fees to be determined by a court of competent jurisdiction unless otherwise agreed to by the parties, incurred in connection with performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by the Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence on its part. In the event of any litigation between the parties, the Escrow Agent shall not be disqualified from representing

2

Seller therein based upon its role as the Escrow Agent. The Escrow Agent has acknowledged acceptance of these provisions by signing in the place indicated on the signature page of this Agreement.

All interest earned on the full Deposit shall be credited (or paid over) to Buyer at the Closing or termination of this Sales Agreement, notwithstanding anything herein to the contrary.

5.    **LEASE.** At the Closing, the parties shall enter into a Lease Agreement substantially in the form attached hereto as <u>Schedule C</u> (the "Lease").

6.    **CONDITION.** This Agreement is conditioned on the approval of the Middlefield Board of Selectmen on or before <u>Dec    1st</u>, 2008.

7.    **DUE DILIGENCE.** Buyer has conducted an investigation of the Real Property, including but not limited to, an engineering and environmental investigation, a title search, research regarding the availability of water, sewer and gas connections, review of all previous environmental inspections, and review of all demolition and tank removal documentation. The Real Property is being purchased and will be conveyed **"As Is"** in its present physical condition after examination by the Buyer. The Buyer is relying solely on such examination with reference to condition, value, character and size of the Real Property. Although Seller may have provided third party reports to Buyer, Seller makes no representation whatsoever as to the accuracy of those reports and Buyer acknowledges that such reports are not the basis for its submission of this Sales Agreement or its decision to purchase the Real Property. There have been no representations, warranties, guarantees, statements or information, express or implied, pertaining to the Real Property, its condition, or any other matters, made to or furnished to the Buyer by the Seller or any employee or agent of the Seller, except as specifically set forth in this Sales Agreement.

8.    **CLOSING DOCUMENTS.** At the Closing and upon payment of the purchase price as provided above, the parties shall execute the Lease; and the Seller shall deliver, and the Buyer shall accept a Quit-Claim Deed (in a form substantially similar to <u>Schedule D</u> attached hereto) conveying the Real Property and a Bill of Sale (in a form substantially similar to <u>Schedule E</u> attached hereto) conveying the Personal Property, all according to Connecticut practice together with required state and local conveyance tax returns to the State of Connecticut and the Towns of Middlefield, Meriden and Wallingford indicating that the conveyance is exempt from conveyance taxes under Conn. Gen. Stat. § 12-498. At the Closing, the Seller shall execute and deliver any affidavits and certificates customarily delivered in a sale in Connecticut.

9.    **MARKETABILITY OF TITLE.** The title to the Real Property herein required to be furnished by the Seller shall be marketable and the marketability thereof shall be determined in accordance with the Standards of Title of the Connecticut Bar Association now in force. Any and all defects in or encumbrances against the title, which come within the scope of said Title Standards, shall not constitute a valid objection on the part of the Buyer if such Standards do not so provide; provided, the Seller furnishes any affidavits or other instruments which may be required by the

3

applicable Standards, and further provided title will be insurable at standard rates by a title insurance company licensed in the State of Connecticut. Buyer represents that it has conducted an independent examination of the title to the Real Property.

10.    **ADJUSTMENTS.**  Real property taxes due to the Town of Wallingford and the City of Meriden and other municipal assessments due to the Town of Wallingford and the City of Meriden for the then current year shall be apportioned as of the Closing Date according to the custom of the city or town in which the Real Property are located, based upon a 365 day calendar year, and the net amount thereof shall be added to or deducted from, as the case may be, the purchase price at the time of the delivery of the Deed. If the current property tax is not then known, the adjustment shall be based on the last known tax. If any sewer or other assessments are being paid in installments, Seller shall only be required to pay such installments due as of the date of the Closing and any current installments which have been paid by Seller shall be prorated on a per diem basis, with Seller paying that portion of such installment due up to the date of closing.

11.    **PHYSICAL INSPECTION:** Buyer acknowledges that it has had the opportunity to have the Real Property physically tested and inspected by mechanical, engineering, environmental and similar inspection services. The Buyer and its agents acknowledge they have had the right of access to the Real Property for the purpose of testing and inspecting the Real Property. The Buyer *further* acknowledges that neither the Seller nor any agent, representative or employee of the Seller has made any representation, promise or warranty of any kind relating to the physical condition of the Real Property or the suitability or permitted uses of the Real Property, on which the Buyer has relied except as herein expressly set forth; and the Buyer covenants that it will accept the Real Property subject to applicable zoning ordinances, and in an **"AS IS"** condition, as such condition exists on the date of Closing. Buyer further acknowledges it has completed its own market due diligence and inspection of the Real Property, and that the purchase price reflects Buyer's informed judgment as to the matters set forth herein. Buyer further acknowledges that it has performed a sufficient examination, in its sole and absolute discretion, of the records, files and documents relating to the Real Property, and it is not relying on any representations of the Seller or any agent or broker of Seller in connection with the condition of the Real Property or the state of any records, files or documents other than as may be specifically set forth in this Sales Agreement. The occurrence of the Closing shall constitute an acknowledgment by Buyer that the Real Property were accepted without representation or warranty, express or implied or otherwise in an **"AS IS"** and "with all faults"' condition based solely on Buyer's own inspection. The Buyer waives any claims, liabilities, costs or expenses against Seller in connection with the Real Property, except as may be specifically set forth in this Sales Agreement. Buyer hereby acknowledges that it has been advised by Seller to visit the Real Property and to conduct, during the contingency period provided for above, such independent due diligence reviews and verifications as Buyer deems necessary for a full evaluation of the Real Property. This provision shall survive the delivery of the Deed.

12.    **ENVIRONMENTAL.**  In connection with the foregoing, Seller does not and has not made and specifically disclaims any representation or warranty regarding the presence or absence of any hazardous substances, as hereinafter defined, at, on, under or about the Real Property, or the

4

compliance or non-compliance of the Real Property with the Comprehensive Environmental Response, Compensation and Liability Act, the Superfund Amendment and Reauthorization Act, the Recourse Conservation Recovery Act, the Federal Water Pollution Control Act, the Federal Environmental Pesticides Act, the Clean Local "Superlien Statute", 42 U.S.C. Section 6401 et seq., CERCLA, as amended, 42 U.S.C. Section 9601 et seq., the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Section 1802 et seq., the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq., Title 22a of the Connecticut General Statutes, as amended; any mixture of sewage or other waste materials that passes through a sewer system to a treatment facility; any industrial waste-water discharges subject to regulation under Section 402 of the Clean Water Act, 33 U.S.C. Section 1342 et seq.; any source, spent nuclear or by-product material as defined by the Atomic Energy Act of 1954, 42 U.S.C. Section 2014; domestic sewage; and all waste materials and storage devices regulated by the Hazardous and Solid Waste Act of 1984 (said statutes and any regulations now or hereafter adopted and publications, promulgated pursuant thereto collectively, the "Acts"), or any other statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability (including strict liability) or standards of conduct concerning any hazardous substances (collectively, the "Hazardous Substance Laws"). For purposes of this Sales Agreement, the term "Hazardous Substances" shall mean and include those elements or compounds which are contained in the list of Hazardous Substances adopted by the United States Environmental Protection Agency and the list of toxic pollutants under any Hazardous Substance Laws and shall mean any material which may be dangerous to health or to the environment, including without limitation all "hazardous materials," "hazardous substances," "oil," "waste oil," or "petroleum products," all as defined by applicable state and federal law, and any other form of environmental contamination. Buyer further acknowledges that neither Seller nor any broker or agent of Seller has provided any representation or warranty with respect to the existence of asbestos or other Hazardous Substances on the Real Property other than as may be specifically set forth in this Sales Agreement. Buyer shall have no recourse or claim against Seller with respect to any loss or damage claimed or suffered by any third party arising from asbestos or other Hazardous Substances on the Real Property. In addition, Buyer hereby releases Seller from all losses, claims, liabilities, costs and expenses in connection with the presence of any Hazardous Substances on the Real Property, or the violation or any Hazardous Substances Laws or other environmental laws, regulations or provisions with respect to the Real Property, including, without limitation, any matters arising after the Closing Date.

13.   **RISK OF LOSS.** Throughout the period between the date of this Sales Agreement and the Closing Date, all risk of loss with respect to the Real Property shall be on the Seller.

14.   **PERSONAL PROPERTY.** (a) Foreclosure Sale of Personal Property. The parties acknowledge that Seller conducted an auction of the personal property on October 30, 2008 (the "Auction"). To ensure that Seller shall have good and marketable title to the Personal Property, the parties have agreed that Buyer, which the parties acknowledge holds a first priority security interest in the Personal Property, shall foreclose on the Personal Property by private sale to Seller under Article 9 of the Uniform Commercial Code (the "Foreclosure Sale"). Seller agrees to purchase the Personal Property through the Foreclosure Sale for the full amount of the unpaid taxes on the 2004-

5

2007 Grand List plus the assumption of taxes not yet due on the 2007 and 2008 Grand List. Such amount is due on January 31, 2009 (the "Foreclosure Sale Price"). Following Seller's purchase of the Personal Property under the Foreclosure Sale, Seller shall convey the Personal Property to Buyer under the terms set forth hereunder in full satisfaction of its obligations to pay the Foreclosure Sale Price.

(b)    Limited Warrantees. Seller shall warrant and covenant that the Personal Property transferred under the Bill of Sale is free and clear of liens, claims or encumbrances. Seller shall indemnify and defend Buyer from and against any claims of others with respect to the Personal Property arising from Seller's breach of its warranty of title. The Seller is neither a manufacturer nor distributor of, nor dealer nor merchant in, any of the Personal Property. Seller makes no warranty of merchantability with respect to the Personal Property, which Personal Property is hereby transferred in an "AS IS, WHERE IS" condition, "WITH ALL FAULTS". Buyer affirms and acknowledges that Buyer has not relied on Seller's skill or judgment with respect to the Personal Property for any particular purpose.

(c)    Examination of the Personal Property. Buyer acknowledges that Buyer has examined the Personal Property as fully as desired. Buyer accepts all risk of loss and releases the Seller from any duties with respect to the Personal Property from and after the date hereof.

(d)    Buyer's Cooperation Regarding the Auction. Buyer agrees to disburse the personal property to third party bidders at the Auction and to collect on Seller's behalf the sums due. Buyer is not responsible if any third party bidder does not honor its bid. Upon consummation of the Sale Agreement Seller shall permit Buyer to retain the proceeds collected less the Seller's documented attorney's fees, costs of advertising the sale and other costs related to such sale, with the understanding that such amount shall not exceed $4,000.00.

15.    **BROKERAGE WARRANTY**. The Buyer and Seller warrant and represent to each other that they have not dealt with any broker or person entitled to a broker's commission in connection with the negotiation or execution of this Sales Agreement or the consummation of the transaction contemplated hereby, and the Buyer and Seller agree to hold harmless and indemnify the other against all damages, claims, losses and liabilities, including legal fees, incurred by the other arising out of or resulting from the failure of its warranty and representation. This provision shall survive the delivery of the Deed.

16.    **BUYER'S WARRANTIES AND REPRESENTATIONS**. Buyer hereby warrants and represents to Seller that it has full power and legal authority to enter into this Sales Agreement for the purchase of the Real Property. Buyer further warrants and represents that neither its execution of this Sales Agreement, nor the consummation of the transaction contemplated by this Sales Agreement will result in a breach of, or violation of, any agreement or covenant to which Buyer is signatory or is otherwise bound. Buyer agrees to provide Seller with any and all documentation Seller may reasonably require evidencing its authority to enter into this transaction.

17.   SELLER'S WARRANTIES AND REPRESENTATIONS. Seller hereby warrants and represents to Seller that it has full power and legal authority to enter into this Sales Agreement for the sale of the Real Property.  Seller warrants and represents that neither its  execution of this Sales Agreement, nor the consummation of the transaction contemplated by this Sales Agreement will result in a breach of, or violation of, any agreement or covenant to which Buyer is signatory or is otherwise bound. Seller agrees to provide Seller with any and all documentation Seller may reasonably require evidencing its authority to enter into this transaction.

18.   NOTICE. All notices required or to be given hereunder shall be in writing and deemed duly given when delivered or mailed by registered or certified mail, return receipt requested, postage and registration or certification charges prepaid, addressed as follows:

> **If to Seller:**
>
> c/o WCP Investment Manager, LLC
> 55 Post Road West
> Suite 320
> Westport, Connecticut  06880
>
> with a copy to:
>
> LeClairRyan, A Professional Corporation
> 555 Long Wharf Drive
> Eighth Floor
> New Haven, Connecticut  06511
> Attn:   Niclas A. Ferland, Esq.
>
> and
>
> **If to Buyer:**
>
> Middlefield Town Hall
> 393 Jackson Hill Road
> Middlefield, Connecticut  06455
> Attn: _____
>
> with copies to:
>
> Joseph P. Fasi, Esq.
> Robert A. White, Esq.
> Murtha Cullina LLP
> CityPlace I
> 185 Asylum Street, 29th Floor

Hartford, Connecticut  06103-3469

or to such other address or addresses as may from time to time be designated by either party by written notice to the other.

19.     **SALES AGREEMENT NOT TO BE RECORDED.**   If Buyer records this Sales Agreement or a copy or a memorandum hereof, this Sales Agreement shall, at Seller's option, terminate and all deposits hereunder shall be paid to Seller and become Seller's property as its sole and exclusive remedy.

20.     **TITLE.**   Subject to the terms contained herein and incorporated herein by reference, title shall be conclusively deemed in compliance with the requirements of this Sales Agreement.

21.     **TITLE INSURANCE AFFIDAVITS.**   The Seller agrees to furnish the Buyer, at the time of the delivery of the Deed, executed affidavits regarding mechanics and materialmen's liens and parties in possession sufficient to eliminate any title insurance exceptions for these matters.

22.     **TIME.**   Whenever any time period is to be computed hereunder, the day from which the period shall run is not to be included, and any period ending on a Saturday, Sunday or legal holiday will be extended to the next business day.

23.     **CONSTRUCTION OF SALES AGREEMENT.**   This instrument, executed in multiple counterparts, is to be construed as a Connecticut contract, is to take effect as a sealed instrument, sets forth the entire contract between the parties, is binding upon and inures to the benefit of the parties hereto and their respective successors and, subject to any provisions regarding non-assignability of this Sales Agreement, assigns, and may be canceled, modified or  amended only by a written instrument executed by both the Seller and the Buyer or their successors in interest. The captions are used only as a matter of convenience and are not to be considered a part of this Sales Agreement or to be used in determining the intent of the parties.

WITNESS the execution hereof under seal as of the day first above written.

**Middlefield Holdings, LLC**
By: WCP Investment Manager, LLC its manager

BY: _____
     Name: Matthew Londau
     Title: Principal

And

BY: _____
     Name: Max Porovoff
     Title: Principal and General Counsel


**Town of Middlefield**

BY: _____
     Name: JON A. BRAYSHAW
     Title: FIRST SELECTMAN
     Hereunto Duly Authorized

ACCEPTED BY:

ESCROW AGENT:

**CATIC Exchange Solutions, Inc.**

By: _____
    Name:
    Title:

9

## SCHEDULE A

## Description of Real Property

# SCHEDULE   A

Properties  1,3,4,5&6

Those certain parcels of land with the improvements thereon and appurtenances thereto located in the Town of Middlefield, County of Middlesex and the City of Meriden, County of New Haven, and the Town of Wallingford, County of New Haven, all in the State of Connecticut, shown as "PARCEL 'A' AREA = 239.6 AC. +"and "PARCEL 'B OTHER LAND OF ZEMEL BROTHERS, INC VOL. 655 PG. 104 " on a certain map or plan entitled: "BOUNDARY SURVEY PLAN PREPARED FOR WHITE WATER MOUNTAIN RESORTS OF CONNECTICUT, INC. PROPERTY OF ZEMEL BROS., INCORPORATED POWDER HILL ROAD MIDDLEFIELD, MERIDEN, WALLINGFORD CONNECTICUT DATE: DECEMBER 13, 1996 SCALE: 1" = 100' SHEETS 1, 2, AND 3 OF JOB NO. 933125 ANGUS McDONALD/GARY SHARPE & ASSOCIATES, INC. P.O. BOX 608 233 BOSTON POST ROAD OLD SAYBROOK, CONNECTICUT 06475 TEL. (860) 388-4671 FAX (860) 388-3962 CIVIL ENGINEERS PLANNERS SURVEYORS," which map or plan is on file in the Offices of the Town Clerks in the Towns of Middlefield and Wallingford and the City of Meriden, Connecticut.

Said premises are together with the following:

Appurtenant use restriction and reversionary right set forth in a Quit Claim Deed from Zemel Bros., Inc. to Regional Training School and Sheltered Workshop, Inc. dated May 31, 1966 and recorded October 11, 1966 in Volume 34, Page 455 of the Middlefield Land Records.

Appurtenant rights reserved in a Warranty Deed from Zemel Bros., Incorporated to Joseph J. Ferrera and Lori A. Ferrera dated January 23, 1985 and recorded January 24, 1985 in Volume 54, Page 688 of the Middlefield Land Records.

NOTE:

No title is insured for that portion of the premises shown as located in the Town of Wallingford on the above-referenced map.

<u>SCHEDULE B</u>

<u>Description of Personal Property</u>

## White Water Mountain Resorts of Connecticut, Inc – Personal Property

| | |
|---|---|
| 1 | Partek Triple Chairlift to Top |
| 1 | Borvig Quad converter to Triple Chairlift to Top |
| 1 | Hall Double Chairlift to Top |
| 1 | Hall Beginner Chairlift |
| 1 | Stadeli Handle Tow in Ski School |
| 2 | Schipper Tubing Lifts |
| 1 | FS 100R Stihl Weedwacker |
| 1 | Poulair 44GT Pro Liner |
| 1 | 200 hp Water Pump 750 gpm |
| 1 | 200 hp Water Pump 750 gpm |
| 1 | 200 hp Water Pump 1,000 gpm |
| 2 | 50 hp Water pumps (primer pumps at pond) |
| 1 | Fountain & Pump for pond |
| 1 | Pipeline to Lake Beseck - approx. 3,000 feet (HDPE 10" Pipe) with flanges & fittings |
| 1 | Temporary Electric Service at Lake Beseck for Permanent Pump Station |
| various | Spare sections of HDPE pipe |
| miles | Snowmaking pipe around the hill |
| 1 | 10" Header across the top of mountain |
| 1 | 10" Header across base area (new in 2004) |
| various | Values and hydrants for snowmaking |
| 1 | 900 cfm Ingersoll Rand Electric Compressor |
| 1 | Snow Max System Tank & Piping |
| 1 | Parts Washer |
| 9 | Hand Pumps |
| 2 | Wheel Barrows |
| 1 | Mig Welder 480 Volt |
| 1 | 1,000 Watt Generator |
| 1 | Pisten Bully (have plows with spares) use as utility vehicle |
| 6 | HKD Spectrum Snowguns attached on Lift 4 lift towers |

Any rights in or under: any permits and concessions, executory contracts, the Waterline Lease with the Town of Middlefield dated January 9, 2004, goodwill, all interests in intellectual property collateral of Seller, including without limitation the domain name powderridgect.com, the content of the website displayed at www.powderridgect.com, as well as the names "Powder Ridge Ski Area" (and any derivation thereof) and "Powder Ridge Ski Resort."

SCHEDULE C

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (the "Lease") is made and entered into this _____ day of _____, 2008, by and between the TOWN OF MIDDLEFIELD, a municipal corporation and political subdivision of the State of Connecticut having its principal office at _____, Middlefield, Connecticut _____ ("Landlord"), and MIDDLEFIELD HOLDINGS, LLC, a Delaware limited liability company having its principal office at c/o WCP Investment Manager, LLC, 55 Post Road West, Suite 320, Westport, Connecticut 06880 ("Tenant").

W I T N E S S E T H :

WHEREAS, by Quitclaim Deed of even date herewith, Tenant transferred to Landlord certain real and personal property located at 99 Powder Hill Road, Middlefield, Connecticut 06455, 598 High Hill Road, 552 High Hill Road and 371 Fleming Road in Meriden and property in Wallingford, Connecticut, which real and personal property is also known as the Powder Ridge Ski Area, being more particularly described on Exhibit A attached hereto and made a part hereof (the "Ski Area"); and

WHEREAS, in connection with Landlord's purchase of the Ski Area, Landlord desires to lease to Tenant, and Tenant desires to lease from Landlord, a portion of the Ski Area, subject to the terms, provisions and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

1.      Leased Real Property.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, pursuant to the terms and conditions hereof, the portions of the Ski Area located within the Town of Middlefield but excluding the improved portions thereof, together with all other rights, privileges, easements and appurtenances belonging thereto or granted herein (collectively, the "Leased Real Property").  The Leased Real Property shall not include any of the buildings, structures, or exterior fixtures such as the ski lifts, snow making equipment, pipelines or storage tanks for oil, diesel, natural gas or the like.

2.      Term.  The term (the "Term") of this Lease shall commence on the date of execution hereof and shall terminate, if not sooner, on November 30, 2012.

3.      Rent.  Tenant shall pay rent in the amount of $1.00 per year to Landlord during the Term.

4.      Use of the Real Property.  Tenant shall use the Real Property only as open space for the benefit of the Landlord and shall not engage in any development of the Real Property whatsoever.

Tenant shall comply with all laws, ordinances, rules and regulations of governmental authorities, with respect to the use of the Real Property.

5. <u>Assignment and Sublease</u>. Tenant shall not have the right to assign this Lease in part or in full. Tenant shall not have the right to sublease all or any part of the Real Property.

6. <u>Insurance</u>. Landlord shall procure and maintain, and pay all premiums, fees and charges for the purpose of procuring and maintaining continuously throughout the Term comprehensive general liability insurance having amounts not less than Two Million and No/100 Dollars ($2,000,000.00) for personal injury or death per person, One Million and No/100 Dollars ($1,000,000.00) per occurrence and not less than One Million and No/100 Dollars ($1,000,000.00) for property damage. Tenant shall be named as an additional insured on such policies procured by Landlord.

7. <u>Tenant Indemnification</u>. Tenant will indemnify and save harmless Landlord and Landlord's officers, directors, employees, agents, partners and their respective heirs, successors and assigns (except for loss or damage resulting from the willful misconduct or negligence of Landlord, its agents or employees or the breach of this Lease by Landlord) from and against any and all claims, causes of action, fines, damages, liabilities, judgments, and expenses including reasonable attorneys' fees and court costs, incurred in connection with or arising from (a) the use of the Real Property by Tenant or any person claiming under Tenant; (b) any activity, work, or thing done at the direction of Tenant in or about the Real Property; (c) any acts, omissions, or negligence of Tenant or the contractors, agents, vendors, or employees of Tenant; (d) any breach, violation, or nonperformance by Tenant or the employees, agents or contractors of Tenant of any term, covenant, or provision of this Lease or any law, ordinance, or governmental requirement of any kind. If any action or proceeding is brought against any of the aforesaid indemnified parties by reason of any such claim, Tenant, upon notice from Landlord, will defend the claim at Tenant's expense with counsel reasonably satisfactory to Landlord.

8. <u>Default by Tenant</u>.

(a) <u>Events of Default</u>. The occurrence of any of the following events shall constitute a default by Tenant and the continuance of any such default beyond the applicable notice and grace period shall constitute an "Event of Default" hereunder:

(i) failure of Tenant to comply with any other provision of this Lease if the failure to perform is not cured within thirty (30) days after Tenant receives written notice thereof from Landlord; or

(ii) the subjection of any right or interest of Tenant in this Lease to attachment, execution or other levy, or to seizure under legal process, if not released within sixty (60) days.

(b) <u>Remedies</u>. If an Event of Default occurs, Landlord may elect to terminate this Lease and exercise its right to re-enter and take possession of the Real Property.

9.      Landlord's Access.  Landlord reserves the right to access the Real Property at any time for any reason.  In addition, Landlord, its agents, employees and contractors, may enter the Real Property at any time in response to an emergency, or in connection with the exercise of Landlord's remedies after the occurrence of an Event of Default and, upon prior notice to Tenant, during business hours to inspect the Real Property.

10.     Disclaimer.  Neither Landlord nor any agent or employee of Landlord shall be liable to Tenant, its employees, agents, contractors and licensees for any damage to, or loss (by theft, vandalism or otherwise) of any of Tenant's property and/or of property of any other person, irrespective of the cause of such injury, damage or loss (unless directly caused by Landlord's gross negligence).  Landlord shall not be liable in any event for loss of or damage to any property entrusted to any of Landlord's employees or agents by Tenant.  Landlord shall not be liable for the security or physical safety of Tenant, its employees, agents, contractors, licensees or visitors.  Landlord makes no representation and nothing in this Lease shall be deemed or construed to be a representation or covenant as to the condition of the Real Property.

11.     Waiver and Release.  Tenant waives and releases all claims against Landlord, its employees and agents with respect to all matters for which Landlord has disclaimed liability pursuant to the provisions of this Lease.

12.     Governmental Requirements and Hazardous Materials.

(a)     Hazardous Materials.  Tenant covenants and agrees (i) that Tenant will not violate any Environmental Laws (as hereinafter defined); (ii) that Tenant will not use, store, generate or dispose of any Hazardous Materials (as hereinafter defined) in, on, at or under the Real Property. Tenant further covenants and agrees (i) that Tenant will not cause any release, leak, discharge, spill, disposal, or emission of Hazardous Materials in, at, on or under the Real Property; (ii) other than as to conditions existing at the Real Property as of the date hereof, to give notice to Landlord immediately upon Tenant acquiring any knowledge of the presence of any Hazardous Materials at the Real Property or of any release, leak, discharge, spill, disposal or emission of Hazardous Materials at the Real Property (except as expressly permitted above), with a full description thereof; (iii) to give notice to Landlord immediately of any notice of violation or potential violation of any Environmental Laws received by Tenant; and (iv) to promptly comply with any governmental requirements relating to the removal, treatment or disposal of Hazardous Materials caused by or resulting from Tenant's actions, inactions and/or business operations at the Real Property, and provide Landlord with satisfactory evidence of such compliance.

As used in this Section 12, "Environmental Laws" means any and all present and future federal, state or local laws (whether common law, statute, rule, order, regulation or otherwise), permits, and other requirements of governmental authorities  relating in any manner to the environment (land, air and/or water) or to any Hazardous Materials.  As used in this Section 12, "Hazardous Materials" means

(i)      any substance listed in Section 22a-449(c)-101 of the Regulations of

-14-

Connecticut State Agencies;

(ii)    any pesticide as defined in Section 22a-47 of the Connecticut General Statutes; or

(iii)    any oil or petroleum as defined in Section 22a-448 of the Connecticut General Statutes, except for fuel oil for heating purposes.

Tenant hereby agrees, in addition to and not in lieu of any other indemnities contained in this Lease or otherwise provided by law, that it will indemnify, defend, save and hold harmless Landlord and its officers, directors, shareholders, employees, agents, partners, and their respective heirs, successors and assigns (collectively "Indemnified Parties") against and from, and to reimburse the Indemnified Parties with respect to, any and all damages, claims, judgments, penalties, fines, liabilities, loss, costs and expenses (including, without limitation, all attorney's fees and expenses, court costs, administrative costs, costs of appeals, consultant's and expert's fees and expenses), incurred by or asserted against the Indemnified Parties by reason of or arising out of: (a) the breach of any representation or undertaking of Tenant under this Section 12 or (b) arising out of the Treatment of any Waste by Tenant or any licensee, concessionaire, manager or other party occupying or using the Real Property through or under Tenant, or in or affecting the Real Property. This indemnification of Landlord by Tenant also includes, but is not limited to, costs incurred in connection with any investigation by Landlord of site conditions from time to time (provided Landlord has a reasonable basis for such investigations) or of any cleanup, remedial, removal or restoration work required by any federal, state or local government agency or political subdivision or considered prudent by Landlord because of any release of Hazardous Materials or breach of this Section 12 by Tenant or any licensee, concessionaire, manager or other party occupying or using the Real Property during the Term hereof.

Landlord is given the right, but not the obligation, to inspect and monitor the Real Property and Tenant's use of the Real Property in order to confirm Tenant's compliance with the terms and the representations set forth in this Section 12.

Tenant agrees to deliver, within fifteen (15) days after request from Landlord, certificates to Landlord expressly stipulating whether Tenant is engaged in or has engaged in the Treatment of any Waste in or affecting the Real Property, and whether the Tenant has caused any spill, contamination, discharge, leakage, release or escape of any Waste in or affecting the Real Property, whether sudden or gradual, accidental or anticipated, or of any other nature, at or affecting the Real Property and whether, to the best of Tenant's knowledge, such an occurrence has otherwise occurred at or affected the Real Property.

(b)    Survival.  All of the terms, covenants, warrantees and indemnifications contained in this Section 12 shall survive the termination of this Lease.

13.    Early Termination Option.  At any time during the Term, Landlord has the option to terminate Tenant's interest hereunder by paying to Tenant the sum of $225,000.00. Such option may be exercised upon 10 calendar days' written notice by Landlord to Tenant. Upon Tenant's receipt of

such $225,000.00 payment, the parties hereunder shall simultaneously execute a Termination of Lease substantially in the form as set forth in Exhibit B attached hereto. Thereafter, this Lease shall terminate and, except as otherwise stated herein, the parties shall no longer have any rights or obligations hereunder.

14.    Taxes. If at any time, the Leased Real Property is not exempt from real estate taxes, Landlord will be responsible for all such taxes.

15.    Arbitration. In the event of any dispute between Landlord and Tenant concerning (i) the nature or existence of an Event of Default or damage arising therefrom under this Lease; or (ii) the interpretation of the provisions of this Lease, Landlord and Tenant shall make a good-faith effort to resolve the dispute by mediation for a period not to exceed thirty (30) days after the dispute is claimed by written notice to the non-disputing party. If the dispute is not resolved within that period, the dispute shall be settled by arbitration in New Haven, Connecticut, in accordance with the rules of the American Arbitration Association as then existing, and judgment upon the award rendered may be entered in any court having jurisdiction thereof. Notwithstanding the foregoing, any claims by the Landlord to recover possession of the Real Property after an Event of Default that is either (i) not disputed by Tenant, or (ii) is disputed, but is confirmed by such arbitration, including, but not limited to, summary process pursuant to Conn. Gen. Statutes Section 47a-23 *et seq.*

16.    Address for Notice. Any notice required or permitted to be given or served by either party to this Lease shall be in writing and deemed to have been given or delivered, as the case may be, (i) when delivered if delivered personally, (ii) three (3) days after deposit in the United States Post Office, Certified or Registered mail, Return Receipt Requested, postage prepaid, or (iii) one (1) business day after deposit with a national overnight express carrier, such as Federal Express or United Parcel Service, charges prepaid, addressed as follows:

> Landlord:

> Town of Middlefield
> Town Hall
> 393 Jackson Hill Road
> P.O. Box 179
> Middlefield, Connecticut  06445

> with a copy to:

> Murtha Cullina LLP
> CityPlace I – 185 Asylum Street
> Hartford, Connecticut  06103-3469
> Attn:   Joseph P. Fasi, Esq.
>         Robert A. White, Esq.

Tenant:

Middlefield Holdings, LLC
c/o WCP Investment Manager, LLC
55 Post Road West, Suite 320
Westport, Connecticut 06880

with a copy to:

LeClairRyan
555 Long Wharf Drive
Eighth Floor
New Haven, Connecticut 06511
Attn:   Niclas A. Ferland, Esq.

17.     Governing Law.  The terms of this Lease shall be governed by and construed in accordance with the laws of the State of Connecticut.

18.     Entire Agreement.   All negotiations, considerations, representations and understandings between the parties are merged herein and may be modified or altered only by an agreement in writing between the parties hereto.

19.     Captions.  The headings of the several articles and sections contained herein are for convenience of reference only and do not define, limit or construe the contents of such articles and sections.

20.     Partial Invalidity.  If any term or provision of this Lease shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Lease shall not be affected thereby, but each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by-law.

21.     Binding Effect.  This Lease and each and every covenant, agreement, condition and undertaking shall be binding upon and inure to the benefit of the respective parties hereto, their legal representatives, heirs, executors, administrators, successors and assigns.

22.     Notice of Lease.  The parties shall not record a Notice of Lease on the Middlefield Land Records.

23.     Not a Partnership.  Nothing herein contained shall be construed as creating a partnership, joint venture or any other relationship between Landlord and Tenant, other than that of landlord and tenant.

24.     Merger.  If both Landlord's and Tenant's estates in and to the Real Property become vested in the same owner, this Lease shall not be destroyed by application of the doctrine of merger except by the Landlord's express election.

25.     Waiver. No waiver of any of the terms or conditions of this Lease shall be binding or effective unless expressed in writing and signed by the party giving such waiver.

26.     Attorneys' Fees. If either party hereto brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in such action shall be entitled to reasonable attorneys' fees and costs of suit.

27.     Authority. Each individual executing this Lease personally warrants and represents that he is authorized to enter into this Lease on behalf of his respective corporation and to bind said entity with respect to any transaction contemplated by or occurring under the provisions of this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date first above written.

TOWN OF MIDDLEFIELD

By:     _____
        Name:
        Title:
        Hereunto Duly Authorized

Date:   _____

MIDDLEFIELD HOLDINGS, LLC

By:     WCP Investment Manager, LLC, Its
        Manager

        By:     _____
                Name:
                Title:
                Hereunto Duly Authorized

        Date:   _____


        By:     _____
                Name:
                Title:
                Hereunto Duly Authorized

        Date:   _____

<u>EXHIBIT A</u>

<u>Description of the Real Property</u>

That certain piece or parcel of land, with the buildings and improvements thereon, situated in the Town of Middlefield, County of Middlesex and State of Connecticut, and in the City of Meriden and Town of Wallingford, County of New Haven and State of Connecticut, being shown and described as "Land to be Conveyed to Ski Middlefield, Inc. Area = 113.0 Ac.±" on a certain map or plan entitled "OVERALL PLAN SHOWING PROPERTY LINE REVISIONS PROPERTY OF WHITE WATER MOUNTAIN RESORTS OF CONNECTICUT, INC., POWDER HILL ROAD, MIDDLEFIELD, MERIDEN, WALLINGFORD, CONNECTICUT" Date: April 10, 2007, Scale: 1"=200', prepared by Angus McDonald Gary Sharpe & Associates, Inc., which map or plan is on file in the Middlefield Town Clerk's Office.

<u>Description of the Personal Property</u>

EXHIBIT B

**TERMINATION OF LEASE**

This Termination of Lease ("Agreement") is made this ____ day of _____, 20__ by and between the TOWN OF MIDDLEFIELD ("Landlord") and MIDDLEFIELD HOLDINGS, LLC ("Tenant").

**PRELIMINARY RECITALS:**

WHEREAS, by a certain Lease Agreement dated _____, 200_ (the "Original Lease"), Landlord leased to Tenant and Tenant took from Landlord portions of certain real property known as 99 Powder Hill Road, Middlefield, Connecticut 06455, said Real Property being more particularly described in the Lease (the "Leased Real Property"); and

WHEREAS, under the terms of the Original Lease, Tenant agreed to terminate the Original Lease upon Landlord's exercise of its buy out option and payment of $225,000.00 to Tenant; and

WHEREAS, Landlord has delivered said $225,000.00 payment to Tenant, and Landlord and Tenant have therefore agreed to terminate the Original Lease in full as of _____ (the "Termination Date").

NOW, THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, Landlord and Tenant hereby agree as follows:

1.     Termination of Lease.  Anything contained in the Original Lease to the contrary notwithstanding, the term of the Original Lease is terminated in all respects as of the Termination Date.

2.     Liability.  Except as otherwise set forth in the Original Lease, Landlord and Tenant release and forever discharge each other and their respective successors and assigns from any and all actions, causes of action, claims, demands, rents, damages, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known or unknown claims or causes of action discovered or not yet discovered relating to or emanating from the Original Lease.

3.     Counterparts.  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same agreement.

-20-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

LANDLORD:

TOWN OF MIDDLEFIELD

By: _____
Name:
Title:

TENANT:

MIDDLEFIELD HOLDINGS, LLC

By:    WCP Investment Manager, LLC, Its
       Manager

By: _____
      Name:
      Title:
      Hereunto Duly Authorized

By: _____
      Name:
      Title:
      Hereunto Duly Authorized

<u>SCHEDULE D</u>

<u>QUITCLAIM DEED</u>

TO ALL PEOPLE TO WHOM THESE PRESENTS SHALL COME, GREETING;

KNOW YE, THAT MIDDLEFIELD HOLDINGS, LLC, a Delaware limited liability company having its principal office at c/o WCP Investment Manager, LLC, 55 Post Road West, Suite 320, Westport, Connecticut 06880 ("Grantor") for the consideration of One Dollar ($1.00) received to its full satisfaction of the TOWN OF MIDDLEFIELD, a municipal corporation and political subdivision of the State of Connecticut having its principal office at 393 Jackson Hill Road, Middlefield, Connecticut 06445 ("Grantee") does give, grant, bargain, sell, convey and confirm unto the Grantee, its successors and assigns forever, with QUITCLAIM COVENANTS, all that certain piece or parcel of land situated in the Town of Middlefield, County of Middlesex and State of Connecticut, and in the City of Meriden and Town of Wallingford, County of New Haven and State of Connecticut (collectively, the "Real Property"), bounded and described as more specifically set forth on <u>Exhibit A</u> attached hereto and made a part hereof.

TO HAVE AND TO HOLD the above granted and bargained Real Property, with the appurtenances thereof, unto it, Grantee, its successors and assigns forever, to its and their own proper use and behoof.

IN WITNESS WHEREOF, Grantor has hereunto set its hand this ____ day of _____, 2008.

Witnesses (as to both):

MIDDLEFIELD HOLDINGS, LLC

By: WCP Investment Manager, LLC, Its
  Manager

_____

Printed Name:

By: _____
  Name:
  Title:

_____

Printed Name:

By: _____
  Name:
  Title:

STATE OF CONNECTICUT          :
                              :    ss. _____ _____, 2008
COUNTY OF _____        :

Personally appeared _____, _____ of WCP Investment
Manager, LLC, the Manager of Middlefield Holdings, LLC, and _____,
_____ of WCP Investment Manager, LLC, the Manager of Middlefield
Holdings, LLC, signers and sealers of the foregoing instrument, and acknowledged that they
executed the same for the purposes therein contained as such _____, on behalf of said
limited liability company, before me.


                              _____
                              Commissioner of the Superior Court
                              Notary Public
                              My Commission Expires:

EXHIBIT A

The Real Property

SCHEDULE E

**BILL OF SALE**

For valuable consideration, the receipt of which is hereby acknowledged, **Middlefield Holdings, LLC**, a Delaware limited liability company having its principal address at c/o WCP Investment Manager, LLC, 55 Post Road West, Suite 320, Westport, Connecticut 06880 ("Seller") hereby sells, conveys and quitclaims to **Town of Middlefield**, a municipal corporation duly existing under the laws of the State of Connecticut having its principal office at 393 Jackson Hill Road, Middlefield, Connecticut 06455 ("Purchaser") all of Seller's right, title and interest in and to all personal property described on <u>Exhibit A</u> attached hereto and made a part hereof (the "Personal Property").    Seller warrants, covenants and agrees that the Personal Property transferred hereunder is free and clear of liens, claims or encumbrances.  Seller shall indemnify and defend Buyer from and against any claims of others with respect to the Personal Property arising from Seller's breach of its warranty of title.  The Seller is neither a manufacturer nor distributor of, nor dealer nor merchant in, any of the Personal Property. Seller makes no warranty of merchantability with respect to the Personal Property, which Personal Property is hereby transferred in an "AS IS, WHERE IS" condition, "WITH ALL FAULTS".  Buyer affirms and acknowledges that Buyer has not relied on Seller's skill or judgment with respect to the Personal Property for any particular purpose.

Purchaser acknowledges that Buyer has examined the Personal Property as fully as desired. Purchaser accepts all risk of loss and releases the Seller from any duties with respect to the Personal Property from and after the date hereof.

SELLER EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY FOR A PARTICULAR PURPOSE.   THE PERSONAL PROPERTY IS BEING SOLD AS IS AND WITH ALL FAULTS. WITHOUT LIMIT-ING ANY OF THE FOREGOING, **PURCHASER EXPRESSLY ACKNOWLEDGES THAT IT HAS HAD AN OPPORTUNITY TO INSPECT THE PERSONAL PROPERTY AND THAT IT ACCEPTS THE PERSONAL PROPERTY AS IS, WITH ALL FAULTS.**

IN WITNESS WHEREOF, the parties have executed and delivered this instrument as of the _____ day of _____, 2008.

SELLER:

MIDDLEFIELD HOLDINGS, LLC

By:    WCP Investment Manager, LLC, Its Manager

    By:_____

        Name:
        Title:
        Hereunto Duly Authorized


    By:_____

        Name:
        Title:
        Hereunto Duly Authorized


AGREED TO AND ACCEPTED BY:

TOWN OF MIDDLEFIELD

By: _____
    Name: JON A BRAYSHAW
    Title: FIRST SELECTMAN
    Hereunto Duly Authorized

-26-